### In re COCHRAN.

(District Court, N. D. Georgia. February 23, 1911.)

No. 232.

1. COURTS (§ 366*) — FEDERAL COURTS — AUTHORITY OF DECISIONS OF STATE COURT.

The court, in determining whether a bankrupt is entitled to exemptions under a state statute, will follow the decisions of the state Supreme Court construing the statute.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 957; Dec. Dig. § 366.*

Conclusiveness of judgments as between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union & Planters' Bank v. City of Memphis, 49 C. C. A. 468.]

2. BANKRUPTCY (§ 399*)—EXEMPTIONS—CONCEALMENT OF ASSETS—EFFECT.

Under Civil Code Ga. 1895, § 2830, declaring that a debtor shall forfeit his right to the exemption allowed by law if he is guilty of fraud in con-

cealing from his creditors any part of his property at the time he seeks the benefit of the exemption, construed by the state Supreme Court to require the utmost good faith of an applicant for the exemption, and a full disclosure of all personal property owned by him at the time he seeks the exemption, a bankrupt seeking an exemption must deal with perfect frankness with his creditors and disclose and deliver all his property except the exemption, and a failure to do so defeats his application, and a bankrupt, who just before and at the time of his bankruptcy sought to get his property out of the reach of his creditors, was not entitled to the exemption.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 669; Dec. Dig. § 399.*]

In bankruptcy proceedings of J. K. Cochran, a bankrupt. Action of Referee in denying the bankrupt exemptions allowed by the Constitution and statutes of Georgia approved.

Dean & Dean and J. M. Hunt, for bankrupt.

Lipscomb, Willingham & Doyal, Davis & England, and Nathan Harris, for trustee.

NEWMAN, District Judge. The question before the court is on a review of the action of the referee denying the bankrupt the exemption allowed by the Constitution and statutes of Georgia.

An involuntary petition in bankruptcy was filed against J. K. Cochran on January 7, 1910. As a part of the schedule filed by him in this proceeding he claimed the exemption of $1,442.25. The referee disallowed the exemption of all the articles claimed except certain household and kitchen furniture. The report, and supplemental report asked for by the court, of the referee are as follows:

"Within the legal time, the trustee, R. J. Ragan, set aside property to J. K. Cochran, bankrupt, to the amount of $1,442.25. To this report the trustee filed objections, alleging that the bankrupt was not entitled to a homestead, for various reasons, and asking that the trustee's report be disapproved. A hearing was had and evidence offered by both the trustee and the bankrupt, in support of their respective positions, and the case was fully argued by counsel for both sides.

"After hearing and considering the case fully, it is ordered that the objections be sustained, and the report of the trustee disapproved, except as to one set of bedroom furniture, valued at $15; one hall tree, $5; one clock, $5; three rockers, $4; one set of bedroom furniture, $20; one sideboard, $8; one stove, $15; cooking utensils, $5; tables, $6; wearing apparel, $20—making a total of $103.

"The referee thinks that this property should be allowed the bankrupt in any event, it consisting of personal effects and wearing apparel, and coming within the $300 allowed the bankrupt, and which could not be waived by him in any event.

"As to the balance of the property set aside by the trustee to J. K. Cochran, as before stated, the report of the trustee is disapproved and the homestead disallowed.

"One of the main reasons for sustaining the objections raised by the trustee was a mortgage given by J. K. Cochran to O. F. Morris, for $1,500, in September, 1909. The bankrupt admitted that he never got but $60 on said mortgage, and testified on general examination in effect that it was made and recorded to deceive his creditors as to his financial condition, and to save himself from being put in bankruptcy; that is, if the creditors found that he had any property, that they would put him into bankruptcy, and he believed that this lien would demonstrate to his creditors that he had no valuable property

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and that it would consequently benefit them nothing to throw him into bankruptcy. This, in the opinion of the referee, was not dealing fairly with his creditors, and should operate to deny him his homestead.

"There are a number of other features, taken in connection with this matter, that have the effect of strengthening the position of the objecting creditors. One of them is the fact that after the fire, which destroyed the bankrupt's store and contents, he collected $1,500 insurance money, and applied but a small portion of it to the payment of his unsecured debts, appropriating a large part of it to a note on which his father was indorser; that he turned over $750 of the insurance money to his brother, J. W. Cochran, out of which he paid the note referred to. Out of the other half the bankrupt claims to have paid some of his unsecured creditors.

"After taking all the evidence in this case, and analyzing it carefully, there is no doubt in the mind of the referee that the bankrupt does not make such a showing as would entitle him to a homestead under the laws of Georgia."

### "Supplemental Report.

"On August 31, 1910, the referee filed his opinion and findings in this matter, holding and ruling that the bankrupt was not entitled to his homestead for a number of reasons set out in the objections to the homestead filed by the creditors. The referee stressed the two propositions of the Morris mortgage and the use by the bankrupt of the insurance money; but the opinion and the finding of the referee was based also on the other grounds urged by the creditors.

"It occurs to the referee that it may be well, at the present time, to give additional reasons for his opinion and finding, and he therefore submits the following:

"The entire business transactions of this bankrupt were before the referee from a period prior to September 13, 1909, at the time he took his brother, J. W. Cochran, into partnership. The evidence discloses to the satisfaction of the referee that the bankrupt was insolvent at that time, and that he was diverting his stock of goods, which had not been paid for, into his house and lot at Rockmart, and that he was doing this for the purpose of subsequently defrauding his creditors.

"Let it be remembered that under the rule laid down in Re Waxelbaum [D. C.] 101 Fed. 228, and other cases, the bankrupt must come into court with clean hands if he desires a homestead. Let it also be remembered that under section 2827 of the Civil Code of Georgia, 1895, a homestead will not be permitted against the purchase money, and if it appears from the record, by sufficient evidence, that the bankrupt, in August and September, 1909, and subsequently thereto, was insolvent, and that he was attempting to divert assets in the form of a stock of goods for which he had not paid into a house and lot, and if his purpose was to then claim a homestead, the referee is confident that he does not come into this court with clean hands, and he finds that the property of the creditors diverted from the stock of goods into the said real estate constitutes purchase money under the Georgia statute.

"Was the bankrupt insolvent in August, 1909, and subsequent thereto? The referee finds that he was.

"The bankrupt admits in his examination that for two years he had never made a financial report when asked for it; that he would answer, 'You can just put it down if you want to, but I won't answer any.' The Rockmart Bank required him to close out his account on August 27th. The cashier testified: 'His account gradually ran down and overdrafts, and I told him the bank didn't want his account. While he had an account there (prior to September, 1909), drafts came on him. He paid some, not all. We usually returned them.' These are some of the direct evidences of insolvency; but the entire record discloses to the satisfaction of the referee, from all the circumstances, that the bankrupt was insolvent prior to September, and was constantly attempting to divert his creditors' goods into a homestead.

"One of the instances of diverting his property into his homestead was the following: On September 13, 1909, he sold a one-half interest of his stock of goods to his brother and received $600. This $600 he used in paying construction accounts on the building on which he now claims a homestead. His

brother was insolvent, but he thereby became a partner, and this bankrupt again diverted property which should have been to pay the creditors by turning over $750 of the insurance money to his brother.

"The record discloses that he was building his house by employing men who owed him in the store and settling their accounts in that way; that he was making contracts for the purchase of the land, for the construction of the house, for the purchase of the material, and paying for the same out of the stock of goods. He said: 'I got the money to build that house out of the business. I paid for part of the labor with goods from the store; part of the money to build the house I got from what people in Temple paid me. It is true that to a great extent I built the house with money from goods from the store, and money for which such goods were sold. I owed for a larger part of the goods that I turned over to the people constructing my house.'

"The house set aside in the homestead was paid for with the insurance money. The 84 bags of cotton seed hulls set aside in the homestead was paid for from the insurance money. The notes set aside in the homestead were nearly all of them for goods sold from the stock, and the stock was not paid for.

"The referee finds from the evidence that the payments made for the house and lot and for the personal property came from the stock of goods. Under the rule in Re Williams, 114 Fed. 190, where circumstances of fraud appear, the referee could not permit a homestead to be set aside in goods themselves, recently purchased, and which were not paid for. Under the same rule, the referee is certain that where the bankrupt has persistently changed his stock of fresh goods into a house and lot, and into personal property, that the homestead should be refused.

"It may be well to call attention to the fact that there are two different bankruptcy proceedings in this same cause. On the 7th day of January, 1910, involuntary proceedings were filed against J. K. Cochran, and he was adjudicated on the 17th day of January, 1910. In making out his schedule, he claimed a homestead. On the 4th day of April, 1910, involuntary proceedings were filed against Cochran Bros., and they were adjudicated on the 20th day of April, 1910. General examination on both these proceedings had been had before the exceptions to trustee's action, setting aside the homestead, were heard. A great deal of evidence from these examinations was introduced in the hearing of this matter. The evidence was voluminous, and only an abstract brief of material evidence was ever certified."

The referee, in denying the exemption, except as to the household and kitchen furniture, evidently acted under section 3380 of Hopkins' Code of 1910 (Code of 1895, § 2830).

It has been frequently held by this court that, where the evidence showed that the bankrupt has fraudulently withheld property from his creditors, he could not be allowed the constitutional exemption of $1,600 in this court. In re Waxelbaum (D. C.) 101 Fed. 228; In re Williamson (D. C.) 114 Fed. 190; In re Stephens (D. C.) 114 Fed. 192; In re Boorstin (D. C.) 114 Fed. 696.

In the Castleberry Case (D. C.) 143 Fed. 1018, the subject was further discussed by this court, and this was said:

"I have hesitated considerably, in view of the peculiar facts in this case, as to whether a case was not made under section 2830 of the Code of Georgia of 1895, for denying the homestead on the ground that the bankrupt has not acted in perfect good faith. I think, however, a careful examination of the section referred to, and the decisions of the Supreme Court of the state on the question, that the first part of section 2830, which requires the bankrupt to act in perfect good faith, is qualified by what follows in the section, and that the good faith required is in making a full and fair disclosure of his personal property. The whole language of the section, I think, shows this, and it is especially shown by the following:

" 'The debtor guilty of willful fraud in the concealment of part of his property from his creditors, of which he is possessed when he seeks the benefit of the exemption, shall, on account of his fraud, lose the benefit of such exemption, and his property shall be subject to the payment of all just debts which he owed at the time such fraud was committed,' etc.

"It is in the making of a full and fair disclosure of property that good faith is required."

As the question here must be determined by a proper construction of the section of the Code referred to, and as this court will follow the decisions of the Supreme Court of Georgia construing this Georgia statute, it may be well to refer to some of the decisions of the state court.

In Torrance v. Boyd, 63 Ga. 22, 29, Justice Bleckley, discussing this statute, says this:

"If the validity of the second proceeding depended alone on its purity, there would still be difficulty in upholding it under the evidence. Certain articles of personalty, of some though not of very considerable value, were held back by the applicant, and neither disclosed nor surrendered. In section 2005, the Code declares that if money or other personal property 'is fraudulently concealed, or is not delivered up for the benefit of his creditors, no exemption shall be made in his favor till it is so delivered up; and all orders of the court heretofore or hereafter obtained by the fraudulent concealment of property as aforesaid, or obtained while the debtor had personal property, money, stocks or bonds which he kept out of the reach of the levying officer, or did not in good faith deliver up for the benefit of his creditors, shall be null and void, and of no effect, and the property set off to the debtor by such order or judgment shall be subject to levy and sale,' etc. Further on in the section, there is a purpose declared to confine this consequence in favor of liabilities of the debtor existing at the time his fraud was attempted, and not let it operate in behalf of creditors, becoming such after the homestead and exemption are set apart. On the trial of the present case Torrance was a witness. The whole of his testimony concerning the gin, thresher, and fan was that they were embraced in the first schedule; that he has them yet, at home and in his possession; and that the first is worth $10, the second $5, and the third $2.50. He offers no explanation, through his own testimony or any other, why they were omitted from the second schedule, why he did not disclose or surrender them. The scheme of the statute, as we understand it, is that a party shall make a full showing of all his personal effects, and that all of them must either be in his schedule or delivered up. He cannot, without the imputation of fraud, retain them, holding them away from his creditors and keeping them out of his schedule, merely because he might have put them in the latter and thus secured them if he would. They are subject to his debts so long as he keeps them out of the schedule, and whatever is subject must be surrendered. There must be a disposition of all his personalty, and the whole must go to his family, or a part to the family and the residue to his creditors if he has creditors at the time. It is not a division between himself and his family, but between his family and his creditors which he is to make if there are existing creditors unsatisfied. Fraud, it is true, is not to be presumed, but must be proved; but we hold that it is proved, prima facie, when the act which the law forbids is proved, and there is no explanation of the purpose or intention. A man is to be understood as intending what he does, and what by way of usual or probable consequence follows immediately from his act, until something appears to rebut or explain the intention. It may be that no attempt to explain was made because of an apprehension that to stir this little matter would expose something larger to detection. At all events, no mind at all on the alert can fail remarking that there is total silence where the circumstances apparently called for something to be said, if anything favorable could be said. The court's charge on this branch of the case was in accordance with the statute."

In Blanchard, etc., v. Paschal, 68 Ga. 32, 45 Am. Rep. 474, in the opinion by Justice Crawford, this is said:

"The third ground of error was the refusal of the court to charge the jury that if, a short time before the application, it appeared that the firm had a large amount of property or money on hand, then the burden was on the applicant to account for it.

"It appears to us that this was a very proper request in view of the testimony, and should have been given. All applicants for personal exemption should come into court ready and willing to account for any large amount of property or money which they may have had only a short time before the application. That is to say, when one of the issues is that a full and fair disclosure of the personal assets of the applicant has not been made, and the creditors show that the applicant did have a large amount of property or money on hand, so immediately before the application as to create the presumption of the concealment or withholding of such property, then that presumption ought to be rebutted. To require the creditors to show assets at the very time of the application would be too narrow a view of the law. But we do not mean to say that any expenditure, though recklessly or improperly made, provided not done so as to reserve the same in some way for himself or family, would defeat the homestead and exemption right. Code 1882, § 2005." (Hopkins' Code, 1910, § 3380.)

In McNally v. Mulherin & Co. et al., 79 Ga. 614, 4 S. E. 332, the Supreme Court again considered this matter, and in the opinion of Justice Blandford the case before the court is stated as follows:

"McNally applied for an exemption of certain personal property, and amended his application by putting in some real estate. The defendants in error, who were creditors of McNally, appeared and objected to his taking the homestead upon the ground of fraud; and upon that issue the parties went to a jury, on appeal in the superior court.

"It was shown by the evidence that, shortly before McNally applied for this exemption, he had possessed himself of the sum of about $800 or $900 in money; and they contended that he must account for it, that he must either surrender it to the court, or must put it in his schedule attached to his application. He replied that he did not have that money, that he had expended it in various ways, in paying lawyers' fees and other debts that he owed; but he fell short of accounting for it to the extent of several hundred dollars. And the court instructed the jury that if he kept or secreted any of his property, and did not place it in his schedule and make a full and fair disclosure of it, he was guilty of fraud; and the jury found against his application."

The court, after discussing a minor ground of error, then proceeds:

"The next position assumed by counsel for plaintiff in error is that the court erred in charging as follows: 'The applicant has no right to withhold such an amount of money as he deems may be needful to employ attorneys, pay licenses, to carry on business, expenses,' etc. We see nothing wrong in that charge. He must make a full and fair disclosure of all his property; and he cannot retain any amount of money which he may deem necessary and needful to employ attorneys, pay licenses, and carry on business; but he must account for it, and, if the schedule runs over the amount he is entitled to, he must produce it in court and turn it over so that his creditors can get it.

"Another portion of the charge objected to is the following: 'If you find from the evidence that John P. McNally, at the time he filed his sworn schedule, withheld and reserved to himself a large sum of money, and that he has not since delivered up said money or amended his schedule by adding it thereto, then I charge you that under the law he is not entitled to a homestead, and you will find against granting his application.' We think that is within the terms of our statute, which declares that he must make a full and fair disclosure of all his property, and that he must act in perfect good faith, and must not fraudulently conceal anything from his creditors. It is not for him to say how much it would take to carry on his business, and pay his expenses, or

what he should retain for attorney's fees, etc. He must put everything in his schedule, and, if he does not do so. the law declares that the court shall not grant him a homestead or exemption.

"The court charged: 'The law says a man must come in with clean hands; otherwise he should not ask a homestead. If he comes into court with clean hands, he is entitled.' We think this charge is right."

And finally the court uses this language:

"We do not think the statute is in violation of the Constitution. The law declares that he must make a full and fair disclosure of everything, and that, if he is guilty of a fraud in failing to do that, he is not entitled to the exemption. It is a punishment for his fraud in the concealment of his property from his creditors; and the Constitution declares that the Legislature can pass such laws as they think proper to ferret out and punish fraud."

It is doubtful whether some of the grounds upon which the referee places his decision in this case can be sustained. They seem to antedate by too long a time the application for exemption. As to some of them, however, I am not certain that they may not be proper grounds of objection to the allowance of the exemption. The above citations from decisions of the Supreme Court of the state show that that court places a construction upon the section of the Code of the state which requires the utmost good faith on the part of those applying for this exemption and a full disclosure of all the personal property owned by the applicant at the time he seeks the exemption.

Independently of the transactions referred to by the referee as to the dealings of the bankrupt in connection with his own property and the property of the firm of Cochran Bros., of which he was a member, there are certain transactions referred to in the evidence which, it seems to me, are amply sufficient to defeat the claim for the constitutional exemption.

After the fire which destroyed the stock of merchandise owned by the firm, the bankrupt did business for a while before his bankruptcy under the name of the "Cochran Grain Company." He had on hand a considerable amount of hay, which he had received shortly before the involuntary petition was filed against him, and the evidence with reference to his disposition of this is contained in the synopsis of the testimony of two witnesses and his own testimony, as follows:

D. H. Hubbard, a witness for the trustee, says:

"The stuff I saw hauled away from Cochran's warehouse on the day he was said to be in bankruptcy amounted to $200 or $300; that is just a guess. I have had sufficient experience in the feed business to make a reasonably accurate estimate, and by guess I mean my best estimate."

A. S. Williamson, a witness for the bankrupt. testified:

"I am marshal of Rockmart and run a coalyard. Just before Mr. Cochran went into bankruptcy, I hauled eight bales of hay from his store. A week or so before Mr. Cochran told me he wanted some coal and would trade hay. I was getting the hay in payment. My wagon would not have had time to haul more hay than the eight bales."

J. M. Hammond, a witness for the bankrupt, testified as follows:

"Just before Mr. J. K. Cochran was put in bankruptcy I ordered a ton of hay with him, and when he was shut up I hadn't got all of mine, and I hauled mine out. I ran a stable, and Mr. Cochran had an order and told me he could

buy hay cheaper. I believe I paid $21 for that ton. My wagon was only gone long enough to haul one load."

The bankrupt himself gave this testimony:

"On the day of the bankruptcy proceedings, Mr. Gus Williamson hauled from my store some seven or eight bales of hay. Mr. Jim Hammond hauled, I think, eight bales, and I sent two bales to feed my horse. I had ordered a ton of hay for Mr. Hammond, and he had no place to keep it, and hauled it away that afternoon; he had paid for it before. I had swapped some to Mr. Williamson for coal. Each one came only once. If any other goods were sold I don't remember. I made no disposition of goods that day in anticipation of bankruptcy. This business was in my own name, not Cochran Bros. I know of no assets of mine of Cochran Bros. not set out in the schedule. I have concealed no property from this court. I will not swear that hay was the only goods taken away that day. There could have been goods taken away without my knowledge, as much as $25; not as much as $50. I will swear that $100 worth wasn't hauled away; there wasn't any seven or eight loads."

E. B. Jones testified to a peculiar transaction, occurring, apparently, just before the bankruptcy, as follows:

"Some time between the 1st of December and Christmas I bought from Cochran Bros. goods to the amount of about $25; some paper bags, oysters, baking powders, soap, and a paper frame. I found them at Thomason's restaurant in Rockmart. Mr. J. K. Cochran told me where to get them. I don't know where they came from. I paid J. K. Cochran for them."

It seems perfectly clear from the foregoing that the bankrupt was seeking, just before and at the time of his bankruptcy, to get his property out of the reach of his creditors, and he apparently succeeded in doing so.

The value of the property so withheld need not be much, as indicated by the language of Justice Bleckley in Torrance v. Boyd, supra. The property withheld there seems to have been of the value of $17.50, yet it was held sufficient to deprive the applicant of the exemption. Under the statute of Georgia controlling on this subject, if a bankrupt seeks to take from the estate property under the constitutional exemption, he must deal with perfect fairness with his creditors and must disclose and deliver up everything he has except this exemption, and the failure to do this will defeat the application.

The property applied for here was of the estimated value of $1,-442.25. The referee considered him entitled to what is called the "statutory exemption" in Georgia, and I agree with him as to that. A mistake seems to have been made by the referee in omitting one $20 item from the articles he allows, which was contained in the application. The amount of household and kitchen furniture named in the application is $123, and the referee will allow this amount. His action in denying the exemption above this amount is approved.